**UNITED FOOD & COMMERCIAL WORKERS UNION, LOCAL 1099, et al., Plaintiffs–Appellees,**

v.

**SOUTHWEST OHIO REGIONAL TRANSIT AUTHORITY, Defendant–Appellant.**

No. 97–4126.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1998.

Decided Dec. 10, 1998.

Robert B. Newman (argued and briefed), Newman & Meeks, Cincinnati, OH, for Plaintiffs–Appellees.

Richard M. Goehler (argued and briefed), Jill M. Vollman (briefed), Ana Maria Merico–Stephens (briefed), Frost & Jacobs, Cincinnati, OH, for Defendant–Appellant.

Before: WELLFORD, MOORE, and CLAY, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. WELLFORD, J. (pp. 364–65), delivered a separate opinion concurring in the result.

## OPINION

MOORE, Circuit Judge.

The United Food and Commercial Workers Union, Local 1099 ("UFCW" or the "Union") challenges on First Amendment grounds the decision of the Southwest Ohio Regional Transit Authority ("SORTA"), a state agency, to reject the Union's proposed wrap-around bus advertisement on the grounds that the ad was too controversial and not aesthetically pleasing. After concluding that the balance of equities favored UFCW, the district court granted UFCW's request for preliminary injunctive relief requiring SORTA to accept the proposed ad. We now affirm.

## I. FACTS AND PROCEDURAL HISTORY

SORTA, a state agency, operates the Queen City Metro bus service in the Cincinnati metropolitan area. As part of its commercial venture, SORTA sells advertising space on its bus shelters and buses, including vinyl, illustrated ads that wrap-around the exterior of its Metro buses. SORTA accepts a wide variety of advertisements for its Queen City Metro bus exteriors, including public-service, public-issue, and political advertisements in addition to traditional commercial advertisements. SORTA's advertising policy (the "Policy"), however, specifically excludes "[a]dvertising of controversial public issues that may adversely affect SORTA's ability to attract and maintain ridership," [1] and requires that all ads "be aesthetically pleasing and enhance the environment for SORTA's riders and customers and SORTA's

standing in the community." J.A. at 783–84 (Def.'s Ex. 501).

In 1994, UFCW purchased from SORTA a wrap-around bus advertisement for a Queen City Metro bus. The ad displayed photographs of smiling union members against a blue background, and contained pro-union messages—"Please Shop Union Grocery Stores," "Shop Union," "Union Shop," "UFCW Local 1099," "We Care About You," "Organize Today!!!," and "Union Yes!!!". J.A. at 652–53 (Pl.'s Exs. 7 & 8). Despite some reservations, the General Manager of SORTA, Paul Jablonski, approved the "Blue Bus" advertisement. J.A. at 465–67 (Jablonski Test.). Jablonski testified that SORTA did not receive any complaints about the Blue Bus advertisement. J.A. at 496 (Jablonski Test. (testifying that no rider has ever complained to him that a particular bus ad did not enhance the environment)). In January, 1997, UFCW informed SORTA of its intent to renew its contract on the Blue Bus, and was assured that the contract would be renewed so long as the exterior of the Blue Bus was in good condition. J.A. at 516, 526 (Dudley Test.).

On February 7, 1997, UFCW members staged a protest at the Hyatt Regency Hotel in downtown Cincinnati, where a meeting of management-side labor lawyers was being held. UFCW used the Blue Bus to transport its members to and from the hotel.[2] Jablonski was told that the UFCW workers had disrupted the meeting, and that when the police were called the workers quickly exited the hotel and "jumped onto the bus and left." J.A. at 468 (Jablonski Test.). Jablonski testified that he "was concerned that an issue like that would receive media attention and that, if Metro was portrayed as ... the getaway vehicle ... that would not enhance [SORTA's] standing in the community." *Id.*

1. Despite SORTA's general exclusion of controversial public issues affecting its ability to maintain its ridership, the Policy explicitly states that "[i]t is not the intention of this Policy to exclude commercial advertisements by political candidates for public office or advertisements concerning ballot issues." J.A. at 783–84 (Def.'s Ex. 501). SORTA has never refused an advertisement supporting a political or judicial candidate. J.A. at 461 (Jablonski Test.).

2. SORTA had a general policy of allowing anyone who purchased a wrap-around bus ad to use the bus for special events. J.A. at 468 (Jablonski Test.). The UFCW apparently had permission to use the Blue Bus for such purposes twice a year. J.A. at 467 (Jablonski Test.).

During this time, UFCW sought to purchase from SORTA a second wrap-around bus advertisement for use in the 1997 Cincinnati Red's Opening Day parade on April 1st. Known as the "Red Bus" advertisement, the proposed ad had a red background and carried pro-union messages similar to those contained in the Blue Bus ad. The proposed ad also displayed a photograph of union members taken during the Hyatt protest. According to UFCW, the message the Union hoped the photograph would convey was "union pride and strength through organizing" by showing everyday people who "were proud to be union members." Pl.-appellee's Br. at 6. The deadline for completing the Red Bus ad copy was March 26, 1997 for the Red Bus to be ready for the Opening Day parade.

On March 25, 1997, UFCW was informed that the Red Bus ad was rejected by Jablonski, who must approve every wrap-around bus advertisement. Jablonski determined that the Red Bus advertisement was unacceptable because it was aesthetically unpleasant and controversial, and it may therefore adversely affect SORTA's image and its ability to attract and maintain its ridership. J.A. at 456, 464 (Jablonski Test.). Specifically, SORTA objected to the ad's photograph, which it described as a "photograph of a mob of persons, many of whom are holding picket signs and certain of whose facial expressions, body positions and placement conveyed a solemn, if not angry, tone and an intimidating visual." J.A. at 70 (Mem. in Supp. of Mot. for Summ. J.). Shortly after the rejection of the Red Bus advertisement, UFCW's contract on the Blue Bus expired. The parties dispute whether UFCW was given the opportunity to renew the Blue Bus contract.

UFCW filed suit in the United States District Court for the Southern District of Ohio pursuant to 42 U.S.C. § 1983. UFCW sought a preliminary injunction ordering SORTA to accept the Red Bus advertisement, as well as compensatory damages, a permanent injunction enjoining SORTA from enforcing its advertising policy against the Red Bus ad, a declaratory judgment that SORTA's advertising policy is unconstitutional on its face, and reasonable attorney fees. After determining that SORTA's rejection of the Red Bus ad was not reasonable, the district court concluded that UFCW demonstrated a substantial likelihood of success on the merits of its claim that the rejection of the ad violated its First Amendment rights. The district court also determined that the loss of First Amendment freedom constitutes an irreparable injury that in this case is not outweighed by harm to others or any public interest. The district court thus concluded that the balancing of equitable considerations favored UFCW, and granted its request for a preliminary injunction.

SORTA sought an emergency stay of the injunction from the Sixth Circuit pending this appeal, which was granted on November 20, 1997.

## II. PRELIMINARY INJUNCTION STANDARD

We have jurisdiction over this interlocutory appeal of the grant of the plaintiff's motion for preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). This court will reverse a district court's granting of a preliminary injunction only when there has been an abuse of discretion. *See N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir.1989). A district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an incorrect legal standard, or applies the law incorrectly. *See id.* at 166–67. In determining whether to exercise discretion to grant a preliminary injunction, the district courts consider the following four factors:

(1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir.1997) (en banc) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir.1995)). These factors are not prerequisites to issuing an injunction but factors to be balanced. *See Unsecured Credi-*

*tors' Comm. of DeLorean Motor Co. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1229 (6th Cir.1985).

The parties dispute whether the moving party bears a heightened evidentiary burden when seeking mandatory preliminary injunctive relief that requires the non-moving party to undertake affirmative action, as distinguished from prohibitory injunctive relief that simply preserves the status quo. Relying on the Tenth Circuit case *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1097 (10th Cir.1991), SORTA argues that the burden to obtain mandatory injunctive relief is more onerous, and that the moving party must show that the four preliminary injunction factors "weigh *heavily* and *compellingly* in favor of granting the injunction." *Id.* at 1097 (emphasis added); *cf. Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir.1997) (stating that when the moving party seeks a mandatory injunction, the party "must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief"). Because the district court did not apply this heightened standard to UFCW's request for mandatory preliminary injunctive relief, SORTA argues that the district court abused its discretion. We believe, however, that the difference between mandatory and prohibitory injunctive relief does not warrant application of differing legal standards. Accordingly, we reject the Tenth Circuit's "heavy and compelling" standard and hold that the district court did not err when it balanced the four equitable factors traditionally considered to determine whether preliminary injunctive relief is warranted.

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir.1978); *see also Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974) (same). Recognizing that preservation of the court's ability to exercise meaningful review may require *affirmative* relief in order to prevent some future irreparable injury, several commentators have criticized judicial hesitancy to disturb the status quo where the conditions favoring injunctive relief are satisfied. *See, e.g.*, 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (1995) ("[I]t is regrettable if [judicial hesitancy to disturb the status quo] leads to the denial of an injunction when the important conditions for its issuance have been satisfied."); *Developments in the Law—Injunctions*, 78 HARV. L.REV. 994, 1058 (1965) ("The concept *status quo* lacks sufficient stability to provide a satisfactory foundation for judicial reasoning."). In *Stenberg*, the Sixth Circuit similarly rejected "any particular magic in the phrase 'status quo.'" *Stenberg*, 573 F.2d at 925. Explaining that "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo," *Stenberg* recognized that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Id.; see also Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 814 (3d Cir.1989); *Canal Auth.*, 489 F.2d at 576. We therefore see little consequential importance to the concept of the status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we reject the Tenth Circuit's "heavy and compelling" standard and hold that the traditional preliminary injunctive standard—the balancing of equities—applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief.

We now turn to the first of the four factors weighed by courts in determining whether to issue a preliminary injunction—"whether the movant has a strong likelihood of success on the merits."

### III. "STRONG LIKELIHOOD OF SUCCESS ON THE MERITS"

UFCW raises several alternative grounds upon which it contends that it is substantially likely to succeed on the merits of its claim that SORTA violated its First Amendment rights. UFCW first argues that the advertising space on the outside of the Queen City Metro buses is a designated public forum, and that SORTA's actions fail the

standard of strict scrutiny applicable to content-based denials of protected speech in a designated public forum. In the alternative, UFCW argues that if the advertising space is a nonpublic forum, SORTA's actions fail the reasonableness standard applicable to the denial of access to a nonpublic forum. Finally, UFCW raises a facial challenge to SORTA's advertisement policy on the grounds that SORTA's policy is unconstitutionally vague. We conclude that SORTA created a designated public forum, and that there is a strong likelihood of success on the claim that the exclusion of the Union's advertisement fails strict scrutiny. In the alternative, even if we were to conclude that the advertising space operates as a nonpublic forum, we nevertheless believe the district court correctly determined that UFCW has demonstrated a strong likelihood of success on its claim that SORTA's reasons for rejecting the Red Bus ad were unreasonable. Finally, we believe UFCW is likely to succeed on its facial challenge to the Policy under both the vagueness and overbreadth doctrines.[3]

3. SORTA argues that UFCW seeks "a limited reversal of the district court's determination as to [some of] the issues" raised below, see Pl.-appellee's Br. at 28, and because this court cannot review determinations by the district court challenged by the appellee absent the filing of a cross-appeal, any such request is improper. Although UFCW stated that it sought a "limited reversal," its arguments reveal that it does not seek an actual "reversal" of the district court's preliminary injunction order, but simply asks this court to affirm the district court's order on alternative grounds rejected by the district court. "The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). This rule stems from the Supreme Court's decision in United States v. American Ry. Express Co., 265 U.S. 425, 44 S.Ct. 560, 68 L.Ed. 1087 (1924), where a unanimous Court stated:

It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought there by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the

## A. Forum Analysis

SORTA, the regional transit authority for Southern Ohio, is "a political subdivision of the state." OHIO REV.CODE ANN. § 306.31 (Banks–Baldwin 1997). As such, its actions are taken under color of state law, and its property constitutes public property. The Supreme Court has adopted a forum analysis for use in determining whether a state-imposed restriction on access to public property is constitutionally permissible. In determining what property constitutes the relevant forum, courts focus on the access sought by the speaker. See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 801, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Because UFCW seeks access to the advertising space encompassing the outside of SORTA's Queen City Metro buses, this advertising space constitutes the relevant forum. See Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148 F.3d 242, 248 (3d Cir.1998) (where plaintiff sought access to defendant's advertising space, the advertising space was the forum at issue); Air

appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

Id. at 435, 44 S.Ct. 560 (emphasis added) (citations omitted). Thus, we have repeatedly held that matters raised below as alternative grounds in support of a district court judgment are properly before us on appeal even though the appellee did not file a cross-appeal. See, e.g., Pusey v. City of Youngstown, 11 F.3d 652, 658 (6th Cir.1993) (affirming district court decision granting summary judgment to defendant-appellee for reasons other than that relied upon by the district court), cert. denied, 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994); Pilarowski v. Macomb County Health Dep't, 841 F.2d 1281, 1286 (6th Cir. 1988) (stating appellee's collateral-estoppel argument was properly before the court where appellee raised the issue in its motion for summary judgment, even though district court relied on alternative ground), cert. denied, 488 U.S. 850, 109 S.Ct. 133, 102 L.Ed.2d 106 (1988); Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co., 772 F.2d 214, 216 (6th Cir.1985) (affirming summary judgment for defendant-appellee on reason argued below by defendant but not considered by the district court). Accordingly, we may properly review any reason advanced by UFCW in support of the district court's preliminary injunction that was presented to the district court.

*Line Pilots Ass'n, Int'l v. Department of Aviation,* 45 F.3d 1144, 1151–52 (7th Cir. 1995) (holding that where plaintiff sought access to display cases in O'Hare Airport terminal, the display case and not the airport was the relevant forum); *cf. Cornelius,* 473 U.S. at 801–02, 105 S.Ct. 3439 (holding that where plaintiff sought access to the Combined Federal Campaign charity drive aimed at federal employees, and not the federal workplace in general, the Combined Federal Campaign was the relevant forum).

The state may exclude speakers from a traditional public forum or a designated public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. "Access to a nonpublic forum, however, can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quotation omitted). The advertising space on the Queen City Metro buses clearly is not a traditional public forum, archetypical examples of which include streets and parks, and we do not understand UFCW to contend otherwise. The parties disagree, however, with respect to whether SORTA designated the advertising space on the buses a public forum, or whether SORTA's advertising space constitutes a nonpublic forum.

### 1. Type of Forum Created

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. In order to discern the government's intent, courts "look[ ] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id.*

The courts will infer an intent to designate property a public forum where the government makes the property " 'generally available' to a class of speakers," *Arkansas Educ. Television Comm'n v. Forbes,* —— U.S. ——, 118 S.Ct. 1633, 1642, 140 L.Ed.2d 875 (1998) (quoting *Widmar v. Vincent,* 454 U.S. 263, 264, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)); or grants permission "as a matter of course." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In contrast, the government indicates that the property is to remain a nonpublic forum "when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it." *Arkansas Educ. Television,* 118 S.Ct. at 1642 (quoting *Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439). Thus, the Supreme Court has been reluctant to hold that the government intended to create a designated public forum when it followed a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers. *See, e.g., Arkansas Educ. Television Comm'n,* 118 S.Ct. at 1642–43 (election debate on public broadcasting station was a nonpublic forum where commission made "candidate-by-candidate determinations as to which of the eligible candidates would participate in the debate"); *Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439 ("The Government's consistent policy has been to limit participation in the [Combined Federal Campaign, a charity drive aimed at federal employees,] to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials."); *Perry Educ. Ass'n,* 460 U.S. at 47, 103 S.Ct. 948 (outsiders seeking to use school mailboxes and interschool delivery system must secure from building principal permission to use the system in order to communicate with teachers).

Discerning whether the government permits general access to public property or limits access to a select few does not end our inquiry, however, for we must also assess the nature of the forum and whether the excluded speech is compatible with the forum's multiple purposes. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. The government's decision to limit access to the property is not

dispositive in answering whether or not the government created a designated public forum. *See id.* at 805, 105 S.Ct. 3439. Rather, we must also examine the relationship between the reasons for any restriction on access and the forum's purpose. A contrary rule that focused solely on whether a speaker must obtain permission to access government property "would allow every designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content." *New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123, 130 (2d Cir.1998), *cert. denied,* ── U.S. ──, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998).

"In cases where the principal function of the property would be disrupted by expressive activity, the Court [has been] particularly reluctant to hold that the government intended to designate a public forum." *Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439. The court's decision in *Cornelius* illustrates this principle. Before 1957, multiple charitable organizations solicited support from federal employees at their work sites "on an ad hoc basis." *Id.* at 791, 105 S.Ct. 3439. As an increasing number of charities sought access to federal work sites, the multiplicity of solicitations for contributions disrupted the workplace and confused employees who were unfamiliar with many charities seeking contributions. *See id.* at 792, 105 S.Ct. 3439. In response, the President established the Combined Federal Campaign ("CFC") "to bring order to the solicitation process and to ensure truly voluntary giving by federal employees," *id.,* as well as "to minimize the disturbance of federal employees while on duty." *Id.* The government limited access to the CFC to "appropriate" charitable agencies, as defined in the campaign guidelines. In determining that the government did not create a public forum in establishing the CFC, the Court emphasized that the limitations on access to the CFC were designed to further the government's goal of minimizing disruption to the workplace, thereby suggesting that the government operated the CFC as a nonpublic forum. *See id.* at 805–06, 105 S.Ct. 3439.

More recently, in holding that an election debate aired on public television is not a public forum, the Court explained that the logistical difficulties of including all ballot-qualified candidates in the debate would undermine the educational value and quality of the debates, frustrating public television's mission of scheduling programming that best serves the public interest. *See Arkansas Educ. Television Comm'n,* 118 S.Ct. at 1643; *cf. Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding a limitation of access to transit system's advertising space to commercial speech and the exclusion of political speech in order to prevent decline in revenue generated by long-term commercial advertising as well as "to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience").

▪ In contrast, the courts will infer an intent on the part of the government to create a public forum where the government's justification for the exclusion of certain expressive conduct is unrelated to the forum's purpose, even when speakers must obtain permission to use the forum. *See, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (even though permission was required to use municipal theaters, the Court applied heightened scrutiny where the reason for exclusion of plaintiff was not related to the public forum's purpose or the preservation of rights of other individuals); *Christ's Bride Ministries,* 148 F.3d at 251 (transit authority's advertising space was a public forum where standards for inclusion and exclusion were promulgated "without reference to the purpose of the forum"); *New York Magazine,* 136 F.3d at 129–30 (because transit authority's restriction on access to its advertising space was unrelated to transit authority's proprietary interests, advertising space was a designated public forum). These cases illustrate that our forum analysis must involve a careful scrutiny of whether the government-imposed restriction on access to public property is truly part of "the process of limiting a nonpublic forum to activities compatible with the intended pur-

pose of the property." [4] *Perry*, 460 U.S. at 49, 103 S.Ct. 948. When the government merely reserves the right to exclude a speaker *"for any reason at all"* or "without reference to the purpose of the forum," the potential for government censorship is at its greatest. *Christ's Bride Ministries*, 148 F.3d at 251. Consequently, if the "concept of a designated open forum is to retain any vitality whatever," we will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum's designated purpose. *Id.* (quotation omitted).

▇▇ In sum, the determination of whether the government intended to designate public property a public forum involves a two-step analysis. First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property. Second, we look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose.

4. The Supreme Court has indicated that other limited government interests, independent of the government's interest in preserving the forum for its other intended uses, may also support placing restrictions on access. *See, e.g., Lehman*, 418 U.S. at 304, 94 S.Ct. 2714 (captive audience); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (controversial speech likely to be attributed to government).

5. Other categories of advertisements that will be excluded include:
 1. Advertising that is unlawful, obscene or indecent, or contains explicit messages or graphic representations pertaining to sexual contact, or contains an offensive level of sexual overtone, innuendo, or double entendre.
 2. Advertising of contraceptive products or hygiene products of an intimately personal nature.
 3. Advertising of products or services with sexual overtones such as massage parlors, escort services, or establishments featuring X-rated or pornographic movies.
 4. Advertising containing foul or offensive language.
 5. Advertising that is harmful to children or is of a nature to frighten children, either emotionally or physically.

▇▇ SORTA's advertising policy states in relevant part as follows:

It is SORTA's policy that its buses, bus shelters and billboards are not public forums. All advertising materials on SORTA's buses, bus shelters and billboards are subject to approval by SORTA. To the fullest extent possible, such advertising materials must be aesthetically pleasing and enhance the environment for SORTA's riders and customers and SORTA's standing in the community.

Examples of advertising material that will be refused under this Policy include, but are not limited to, the following:

. . . .

6. Advertising of controversial public issues that may adversely affect SORTA's ability to attract and maintain ridership. (It is not the intention of this Policy to exclude commercial advertisements by political candidates for public office or advertisements concerning ballot issues.)

J.A. at 783 (Def.'s Ex. 501).[5] We do not believe SORTA's stated intent to operate its advertising space as a nonpublic forum, without more, is dispositive, for we must look to both "the policy *and practice* of the government to ascertain whether it intended to

a. The term "harmful to children" means language or pictures that (i) describe or depict sexual contact, or nudity; (ii) make use of foul language; (iii) describe or depict violent physical torture, destruction, or death of a human being; or (iv) describe or depict criminal activity in a way that tends to glorify or glamorize the activity and that, with respect to children under the age of 18, has a tendency to corrupt.
b. The term "of a nature to frighten children, either emotionally or physically" means language or pictures that describe or depict violent or brutal activities, whether such violence or brutality was intended or not, in a manner that causes children under the age of 18 physical or emotional distress or fear for his personal safety or for the safety of others.

. . .

7. Advertising of tobacco products on any bus traveling on or any bus shelter located in any public right of way, street or highway under the jurisdiction and control of the City of Cincinnati or any of its boards or commissions.

J.A. at 783–84.

designated a place ... as a public forum." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439 (emphasis added); *see also Air Line Pilots Ass'n, Int'l v. Department of Aviation,* 45 F.3d 1144, 1153 (7th Cir.1995) ("[T]he government's stated policy, without more, is not dispositive with respect to the government's intent in a given forum."); *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5,* 941 F.2d 45, 47 (1st Cir.1991) (in determining whether the government has designated public property a public forum, "actual practice speaks louder than words"). Were we to hold otherwise, the government could circumvent what in practice amounts to open access simply by declaring its "intent" to designate its property a nonpublic forum in order to enable itself to suppress disfavored speech. We therefore must closely examine whether in practice SORTA has consistently enforced its written policy in order to satisfy ourselves that SORTA's stated policy represents its actual policy. *Cf. Air Line Pilots Ass'n,* 45 F.3d at 1154 ("[A] court must examine the *actual* policy—as gleaned from the *consistent* practice with regard to various speakers—to determine whether a state intended to create a designated public forum.").

Pursuant to its policy, SORTA has rejected the following advertisements: an advertisement stating that "Monday is a Bitch," J.A. at 785–86 (Def.Ex. 503–04); an advertisement for Rush Limbaugh's radio talk show displaying a caricature of President Bill Clinton with his pants down showing a tatoo stating "I Love Rush," J.A. at 787–90 (Def.Ex. 506–09); an advertisement for Enjoy the Arts stating "Look Around This Bus and Find Someone to Do It With," J.A. at 791 (Def.'s Ex. 511); an advertisement containing an outline of a breast, J.A. at 792 (Def.'s Ex. 511); and a clothing ad determined to be "in bad taste" and "too controversial in content," J.A. at 795 (Def.Ex. 514).

▉ Because UFCW has not identified any advertisements accepted by SORTA that arguably violated the Policy, we have no

reason based on the record at this time to believe SORTA applies its written policy on an ad hoc basis.[6] SORTA's apparently consistent policy of limiting access to its advertising space to those advertisements that conform to its written policy indicates an intent to follow this policy. *Cf. Planned Parenthood of Southern Nev., Inc. v. Clark County Sch. Dist.,* 941 F.2d 817, 823–24 (9th Cir.1991) (school district did not intend to open its publications for indiscriminate use where school district's policies explicitly reserved the right to control content of school publications, including advertisements, and school district's practices were not inconsistent with these policies). Although the rejection of only six proposed advertisements under the Policy suggests that SORTA may permit virtually unlimited access to its advertising space or grants permission as a matter of course, the district court concluded otherwise. J.A. at 41–42 (Dist. Ct. Op. and Order at 11–12); *cf. Planned Parenthood of S. Nev.,* 941 F.2d at 825–26 (holding that although plaintiff Planned Parenthood was the only potential advertiser excluded from defendant school district's school publications, this did not demonstrate that school district granted permission to advertise as a matter of course).

We review the district court's factual conclusions only for clear error. Because we do not believe the district court's factual finding is clearly erroneous, we will assume that those seeking access to SORTA's advertising space must first obtain permission from SORTA, and that this permission is not granted as a matter of course. This does not, however, as explained below, conclusively establish that SORTA's methods of excluding speech are constitutionally permissible.

We must ask whether the exclusion of the Union's message was intended to remove from the forum speech that is incompatible with the forum's principal function. Like the Third Circuit, we believe "[t]he goal of generating income by leasing ad space suggests that the forum may be open to those who pay

---

6. Should UFCW introduce evidence at trial demonstrating that SORTA has not consistently followed its written policy, but instead has maintained an ad hoc policy where the acceptability of an advertisement depends on the whim of the decision-maker, this would strongly suggest that SORTA has created a public forum.

the requisite fee." *Christ's Bride Ministries,* 148 F.3d at 251. However, in examining the nature of the property, we cannot ignore the larger context, i.e., the Metro buses, for the advertising space is not a discrete, self-contained forum separate from the buses upon which the advertisements appear. *See Air Line Pilots Ass'n,* 45 F.3d at 1156; *cf. Cornelius,* 473 U.S. at 805, 105 S.Ct. 3439 (examining whether granting the plaintiffs access to the government's charitable campaign drive for federal employees would disrupt the larger forum, the workplace of federal employees).

SORTA offers three policy justifications for its exclusion of advertisements that are too controversial or not aesthetically pleasing: enhancing the environment for its riders, enhancing SORTA's standing in the community, and enabling SORTA to attract and maintain its ridership. The argument is that, unlike the Southeastern Pennsylvania Transportation Authority ("SEPTA") in *Christ's Bride Ministries,* which retained for itself the authority to reject an advertisement considered "in its sole discretion" to be objectionable without any reference to the purpose of the forum, *Christ's Bride Ministries,* 148 F.3d at 251, SORTA's policies expressly denote an intent to exclude expressive activity that would hinder the forum's larger purpose—the provision of safe, efficient, and profitable Metro bus services. However, we question whether in practice SORTA's determination of the acceptability of a proposed ad substantially differs from the practices of SEPTA considered by the Third Circuit in *Christ's Bride Ministries.* For reasons explained below, we believe the lack of definitive standards guiding the application of SORTA's advertising policy permits SORTA, like SEPTA, to reject a proposed advertisement deemed objectionable for any reason. *Cf. Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.,* 767 F.2d 1225, 1230, 1232 (7th Cir.1985) (affirming district court's finding that transit authority's advertising system constitutes a public forum where no written standards guided application of the transit authority's policy of rejecting controversial speech, in practice the determination to reject an ad as controversial

was subjective, and policy was not consistently enforced but a "laissez-faire policy").

Moreover, where the record indicates that SORTA has rejected few advertisements since the Policy's inception in 1995, we cannot readily surmise that SORTA's exercise of control over access to its advertising space operates so as to ensure that the speech is compatible with the forum's larger purpose. *Cf. Christ's Bride Ministries,* 148 F.3d at 252 (concluding that SEPTA did not maintain "tight control" over the forum where SEPTA has exercised its control over only three ads and that "at least 99% of all ads are posted without objection by SEPTA"); *Planned Parenthood Ass'n/Chicago Area,* 767 F.2d at 1232 (where transit authority's "laissez-faire policy" meant the defendant maintained no consistent system of control over acceptance of advertisements and virtually guaranteed access to those willing to pay, advertising system had become a public forum).

We also find SORTA's stated purpose for limiting advertising on buses only tenuously related, at best, to the greater forum's intended use. This is not a situation like that in *Cornelius,* where the government established a controlled solicitation process to prevent disruption in the workplace, or *Arkansas Educational Television Commission,* where a public broadcasting system logistically could not possibly accommodate all political candidates, or even *Perry Education Association,* where a high school had a direct interest in controlling access to its internal mail system. Here there is no established causal link between SORTA's goal of enhancing the environment for its riders, enhancing SORTA's standing in the community, and enabling SORTA to attract and maintain its ridership, and its broad-based discretion to exclude advertisements that are too controversial or not aesthetically pleasing. Although political and public-issue speech is often contentious, it does not follow that such speech necessarily will frustrate SORTA's commercial interests. Rather, it may be the case that only in rare circumstances will the controversial nature of such speech sufficiently interfere with the provision of Metro bus services so as to warrant excluding a political or public-issue advertisement. *Cf.*

*Air Line Pilots Ass'n*, 45 F.3d at 1157 (stating that "there is no indication that political or public interest messages would generally disrupt air travel services" if displayed in airport terminal's display cases).

. This is not to say SORTA may not limit speech at all once it has opened the body of the bus to public discourse. Not all speech receives the same level of protection. SORTA may, for example, permissibly limit obscene or offensive material, if narrowly tailored to include only less protected speech, as indeed it has apparently attempted to do.[7] But once SORTA permits messages of all sorts to grace its buses, it may not then select among the submitted messages based on their content. Just as a governmental entity may not avoid First Amendment scrutiny simply by declaring that it is not creating a public forum, it may not demonstrate intent to keep the forum nonpublic simply by declaring a purpose that involves excluding protected speech based on its content. *See New York Magazine*, 136 F.3d at 129–30.

We agree with the UFCW that in accepting a wide array of political and public-issue speech, SORTA has demonstrated its intent to designate its advertising space a public forum. Acceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum. *Cf. Christ's Bride Ministries*, 148 F.3d at 252. Acceptance of political and public-issue advertisements, which by their very nature generate conflict, signals a willingness on the part of the government to open the property to controversial speech, which the Court in *Lehman* recognized as inconsistent with operating the property solely as a commercial venture. *See Lehman*, 418 U.S. at 303–04, 94 S.Ct. 2714; *see also New York Magazine*, 136 F.3d at 130; *Planned Parenthood Ass'n/Chicago Area*, 767 F.2d at 1232 ("[S]ince [Chicago Transit Authority] already permits its facilities to be used for public-issue and political advertising, it cannot argue that such use is incompatible with the primary use of the facilities."). Moreover, acceptance of political and public-issue

speech suggests that the forum is suitable for the speech at issue in this case—an advertisement conveying pro-union sentiment. *Cf. Christ's Bride Ministries*, 148 F.3d at 252 (acceptance of virtually all advertisements implied that the created forum was suitable for the advertisement rejected by SEPTA, posters concerning abortion and health issues).

██ We therefore conclude that SORTA, through its policies and actions, demonstrated an intent to designate its advertising space a public forum. As a result, we subject SORTA's refusal to accept UFCW's advertisement to strict scrutiny. "[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439. We think it self-evident that excluding the Union's advertisement based on aesthetics and the limited possibility of controversy fails this historically stringent test.

### 2. Reasonableness of SORTA's Actions

Even if we were to conclude that the exteriors of the Queen City Metro buses are a nonpublic forum, we would still hold that UFCW has demonstrated a strong likelihood that it will succeed on the merits of its First Amendment claim. Restrictions on access to a nonpublic forum must be reasonable and viewpoint neutral. *See Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948. SORTA rests its rejection of the Red Bus ad on its claim that the ad was not aesthetically pleasing and that the photograph contained in the ad has an "in-your-face" or intimidating quality that would prove controversial, thereby undermining SORTA's purpose of enhancing the environment for its customers and maintaining its ridership. J.A. at 464, 480, 484–500 (Jablonski Test.). After reviewing the evidence, the district court determined that SORTA's rejection of the Red Bus ad was unreasonable. J.A. at 46–48 (Dist. Ct. Op. and Order at 16–18). We agree.

---

7. The language in SORTA's policy forbidding obscene or indecent advertising is not before us, and we do not express any opinion regarding the constitutionality of that clause.

356

Where the proffered justification for restricting access to a nonpublic forum is facially legitimate, the government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers. *See Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439. The district court concluded that the decision by SORTA's General Manager, Mr. Jablonski, to reject the Red Bus ad "was based, at least in part, on his displeasure over the use of the Blue Bus at the protest at the Hyatt." J.A. at 48 (Dist. Ct. Op. and Order at 18 n. 1). Clearly any effort to suppress the Red Bus ad due to disagreement with its pro-union message offends the values underlying the First Amendment, for "above all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas." *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *see also Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (government cannot regulate "speech based on its substantive content or the message it conveys"); *Metro Display Adver., Inc. v. City of Victorville,* 143 F.3d 1191 (9th Cir.1998) (city officials violated the First Amendment when they required lessor of bus shelter to remove pro-union advertisement because of the viewpoint expressed). Despite its conclusion that bias against UFCW may have motivated the decision to reject UFCW's Red Bus ad, however, the district court's opinion and order granting the preliminary injunction rests on alternative grounds that assume the absence of bias. We therefore assume for purposes of this appeal that SORTA's stated reasons for its rejection of the Red Bus ad—the ad's controversial nature and poor aesthetic quality—actually motivated the decision to reject the ad.

### a. Reasonableness of SORTA's Advertising Policy

The state may limit access to a nonpublic forum based on subject matter or speaker identity so long as such restrictions are "reasonable." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439.

The district court did not question whether SORTA's policy banning controversial advertising was reasonably related to its stated objective—enhancing SORTA's community image and the environment for SORTA's riders, and attracting and maintaining ridership. We note, however, that the Supreme Court has suggested that excluding speech because its controversial nature adversely impacts the forum's other purposes constitutes a reasonable restriction on access to a nonpublic forum. *See Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439 ("Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose."); *see also Brody v. Spang,* 957 F.2d 1108, 1122 (3d Cir.1992) (" '[R]easonable' grounds for content based restrictions include the desire to avoid controversy."); *Planned Parenthood of Southern Nev., Inc. v. Clark County Sch. Dist.,* 941 F.2d 817 (9th Cir.1991) (en banc) ("avoidance of controversy" constitutes a reasonable justification for refusing plaintiff's potentially controversial advertisement where publication of an ad in the defendant-school district's yearbook and newspaper could create the perception of sponsorship and endorsement by the schools, thereby compromising the school's interest in maintaining its position of neutrality). With respect to SORTA's aesthetic rationale, the district court expressed some reservation over whether this rationale justified excluding otherwise protected speech, but nevertheless assumed "that an aesthetic interest with regard to a specific ad is an appropriate basis for rejection." [8] J.A. at 48 (Dist. Ct.

8. SORTA argues that the district court erred in

subjecting its aesthetic rationale to heightened

Op. and Order at 18). Therefore, for purposes of this appeal, we will assume that SORTA's advertising policy was reasonably related to maintaining the multipurpose environment of the Metro buses.

The assumption, as described above for this appeal, that as a general matter SORTA's advertising policy was reasonable does not end our inquiry, however, for the *application* of the policy must also be reasonable. We therefore must assess whether SORTA had a reasonable basis for concluding that the Red Bus ad violated its advertising policy.

### b. Reasonableness of SORTA's Application of its Policy

 Before considering the evidence offered in support of SORTA's decision to reject the Red Bus ad, we must first determine the level of deference to which SORTA's judgment is entitled. SORTA claims "the district court abused its discretion by substituting its judgment for that of SORTA in determining that SORTA's decision was not 'reasonable.' " Def.-Appellant's Br. at 24. SORTA argues that under the standards applicable to nonpublic fora, its judgment "was entitled to deference" and the district court improperly engaged in an independent assessment of whether the decision to reject the Red Bus ad was reasonable. *Id.* We disagree. SORTA fails to appreciate the distinction between policy determinations and application of state policy. The courts must remain free to engage in an independent determination of whether the government's rules and its application of its rules are rea-

sonably related to the government's policy objectives. *See Planned Parenthood Ass'n/Chicago Area,* 767 F.2d at 1231 (affirming district court's independent fact finding that transit authority's exclusion of plaintiff's advertisement on the grounds that it interfered with the government's proprietary interests was not reasonable but "entirely speculative"); *cf. Cox v. Louisiana,* 379 U.S. 536, 545 n. 8, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (stating that in the area of First Amendment freedoms, the Court has a duty to engage in an independent examination of the record and will not defer to the judgment of the state supreme court, "else federal law could be frustrated by distorted fact finding"). Under our constitutional scheme, any deference to a state agency's expertise "must be tempered by our duty to assure that the government not infringe First Amendment freedoms unless it has adequately borne its heavy burden of justification." *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1459 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). Absent special circumstances, the state must prove the links in its chain of reasoning, for example, that its rules and its application of the rules in fact serve a legitimate interest of the state. *Cf. id.* at 1457–59. A contrary rule deferring to the unproven subjective determinations of state officials absent a clear abuse of discretion would leave First Amendment rights with little protection. An official harboring bias against a particular viewpoint could readily exclude ads communicating that viewpoint simply by "determining" that the ad was controversial, aesthetically unpleasing, or otherwise offensive. We

review by requiring that SORTA's aesthetic interest be "sufficiently substantial to justify its use for restricting protected expression." J.A. at 47 (Dist. Ct. Op. and Order at 17). After recognizing aesthetic harm as a legitimate state interest, the Supreme Court in *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), required that the city's aesthetic interest must be sufficiently important or substantial to justify a prohibition against certain forms of speech in a public forum. *See id.* at 816, 104 S.Ct. 2118. The Court has not addressed whether this heightened standard extends to challenges to restrictions on speech in a *nonpublic* forum or is limited to cases involving a public forum. The circuits appear to be in conflict on this matter. *Compare*

*Multimedia Publishing Co. of S.C., Inc. v. Greenville–Spartanburg Airport Dist.,* 991 F.2d 154, 161 (4th Cir.1993) (applying "sufficiently substantial" standard to airport commission's aesthetic rationale), *with Jacobsen v. City of Rapid City, S.D.,* 128 F.3d 660, 662 (8th Cir.1997) (city's restrictive policy based in part on aesthetic considerations need only be "reasonable"). We need not resolve this matter because the district court never definitively determined whether SORTA satisfied the "sufficiently substantial" standard, but instead assumed that SORTA's aesthetic rationale was "appropriate." Thus, even assuming the district court improperly applied a heightened standard instead of the reasonableness standard, any error by the district court was harmless.

simply will not allow such speculative allegations to justify the exclusion of a speaker from government property.

The reasonableness of excluding a particular advertisement requires a determination of whether the proposed conduct would "actually interfere" with the forum's stated purposes, as set forth in the advertising policy. *See Air Line Pilots Ass'n,* 45 F.3d at 1159; *see also Planned Parenthood Ass'n/Chicago Area,* 767 F.2d at 1231 (affirming district court's finding that transit authority's justification for rejecting plaintiff's advertisement could not be credited where it was "entirely speculative" as to whether acceptance of the advertisement would adversely affect transit authority's commercial interests). The district court concluded that the evidence did not support SORTA's decision to reject the Red Bus ad on the basis of its controversial nature. Of the approximately 49 individuals pictured in the photograph displayed in the Red Bus ad, Jablonski identified only eight individuals as intimidating. J.A. at 484 (Jablonski Test.). Numerous individuals pictured were smiling. J.A. at 650 (Pl.'s Ex. 2). Although some people in the photograph have signs beside them, the group is not arranged in a picket line. *See id.* UFCW's advertising expert testified that the photograph was not an intimidating ad but simply a collection of faces or a range of faces, mostly neutral in expression. J.A. at 555–556 (Galvin Test.). Our independent review of the Red Bus ad and the testimony presented below leads us to agree with the district court's conclusion that "the tone of the photograph is neither angry nor intimidating." J.A. at 46 (Dist. Ct. Op. and Order at 16).

Even assuming the photograph depicted a picket line, the district court properly found that the Red Bus advertisement was unlikely to affect adversely SORTA's proprietary interests. J.A. at 47 (Dist. Ct. Op. and Order at 17). The district court reasonably concluded that any controversy that would attach to the image of a picket line would be no greater than the controversy surrounding unions in general since unions are already associated with picketing. Noting that SORTA had previously run pro-union ads, including one reading "please don't cross our picket lines," without any detriment to SORTA's interests, the district court concluded that "SORTA's decision to reject the proposed Red Bus ad on the basis of its controversiality and potentially adverse effect was unreasonable." *Id; cf. Air Line Pilots Ass'n,* 45 F.3d at 1156 (concluding that where the advertising space at issue "[has] contained 'political' or other public interest messages in the past, the City cannot now claim that those messages are incompatible with the purpose of the forum."). In sum, the evidence does not appear to substantiate SORTA's proffered reasons for rejecting the Red Bus ad. We therefore hold that the district court was not clearly erroneous when it concluded that SORTA's rejection of the proposed Red Bus ad was unreasonable.

With respect to SORTA's rejection of the Red Bus ad on aesthetic grounds, the testimony of Jablonski was the only evidence presented by SORTA in support of its decision. Jablonski testified that he did not find the Red Bus ad aesthetically pleasing. The district court stated that "[t]his assertion, without more, is insufficient to permit the restriction of protected expression," noting that "Mr. Jablonski offered nothing in the way of aesthetic standards or guidelines but merely" his personal opinion. J.A. at 48 (Dist. Ct. Op. and Order at 18). The district court's refusal to rely on Jablonski's subjective opinion as to the aesthetic quality of the Red Bus ad, without any supporting objective evidence, was not clearly erroneous. Accordingly, we affirm the district court's conclusion that UFCW demonstrated that it was likely to succeed on the merits of its claim that SORTA's decision to reject the Red Bus ad plainly fails the reasonableness test.

## B. Facial Challenge to SORTA's Advertising Policy

### 1. Vagueness Doctrine

In addition to challenging SORTA's application of its advertising policy to the proposed Red Bus ad, UFCW also raises a facial challenge to the Policy. Due process requires that we hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary

intelligence can readily identify the applicable standard for inclusion and exclusion. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Not only do "[v]ague laws ... trap the innocent by not providing fair warning," but laws that fail to provide explicit standards guiding their enforcement "impermissibly delegate[ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09, 92 S.Ct. 2294; *see also Leonardson v. City of East Lansing,* 896 F.2d 190, 196 (6th Cir.1990). The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors. *See Leonardson,* 896 F.2d at 198. Quite simply, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). We will not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights; rather, the vagueness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Thus, a statute or ordinance offends the First Amendment when it grants a public official "unbridled discretion" such that the official's decision to limit speech is not constrained by objective criteria, but may rest on "ambiguous and subjective reasons." *Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir. 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997).

SORTA's advertising policy prohibits "controversial" ads that affect adversely SORTA's ability to attract and maintain its ridership. We have no doubt that standing alone, the term "controversial" vests the decision-maker with an impermissible degree of discretion. *Cf. National Endowment for the Arts v. Finley,* —— U.S. ——, 118 S.Ct. 2168, 2179, 141 L.Ed.2d 500 (1998) (concluding that the terms of a provision directing the National Endowment for the Arts to take into consideration general standards of "decency and respect" for diverse beliefs and values of the American public "are undeniably opaque, and ... could raise substantial vagueness concerns" if appearing as part of a regulatory scheme); *Aubrey v. City of Cincinnati,* 815 F.Supp. 1100, 1104 (S.D.Ohio 1993) (holding that Cincinnati Reds' ban on ballpark banners that are not in "good taste" is unconstitutional because the policy "leaves too much discretion in the decision maker without any standards for that decision maker to base his or her determination"). However, SORTA's advertising policy does not broadly ban advertisements SORTA officials find "controversial," but limits the ban to cases where the advertisements adversely affect SORTA's image or ridership. The question then is whether in linking the term "controversial" to SORTA's commercial interests, the term becomes sufficiently precise so as to constrain the decision-maker's discretion and protect those seeking access to SORTA's advertising space from arbitrary or discriminatory treatment.

In *Grayned,* the Supreme Court addressed whether an otherwise standardless term became sufficiently definite when its application required the decision-maker to assess the impact of the speech-related activity on the state's interests. Specifically, the *Grayned* Court considered whether the meaning of the otherwise imprecise terms "noise" and "diversion" as used in an anti-noise ordinance were clear when the ordinance qualified that the noise or diversion is prohibited only where it disturbs or tends to disturb a primary or secondary school session. In holding that the ordinance was not impermissibly vague, the Court concluded that

> [t]he vagueness of these terms, by themselves, is dispelled by the ordinance's requirements that (1) the "noise or diversion" be actually incompatible with normal school activity; [and] (2) there be a demon-

strated causality between the disruption that occurs and the "noise or diversion." 408 U.S. at 113, 92 S.Ct. 2294. The district court concluded that, like the ordinance at issue in *Grayned*, "where the prohibited disturbances are easily measured by their impact on the normal activities of the school," *id.* at 112, 92 S.Ct. 2294, SORTA's advertising policy's ban against "controversial" advertisements clearly identifies the prohibited speech by measuring the proposed advertisements' impact on SORTA's commercial interests. The district court thus concluded that the policy was not unconstitutionally vague. J.A. at 44 (Dist. Ct. Op. and Order at 14). The district court, however, failed to assess whether there existed "a demonstrated causality" between the prohibited controversial advertisements and SORTA's legitimate interest in enhancing the environment for its riders, its ability to maintain its ridership, and its standing in the community. The Supreme Court concluded that the anti-noise ordinance at issue in *Grayned*, when read in light of state supreme court precedent, prohibited "only actual or imminent interference with the 'peace or good order' of the school." *Grayned*, 408 U.S. at 111–12, 92 S.Ct. 2294. In contrast, SORTA's advertising policy contains no such "demonstrated causality" requirement, but instead permits the rejection of controversial ads which merely "may" affect SORTA's ridership. J.A. at 783 (Def.'s Ex. 501). In the absence of requiring a demonstrable causality between an advertisement's controversial nature and SORTA's interests, the Policy invites "subjective or discriminatory enforcement" by permitting the decisionmaker to speculate as to the potential impact of the controversial advertisement on SORTA's interests. *Cf. Desert Outdoor Advertising*, 103 F.3d at 819 (holding void for vagueness a city ordinance that permitted city officials to deny a permit for a structure or sign "without offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community").

The advertising policy's "aesthetically pleasing" requirement similarly invites arbi-

trary or discriminatory enforcement. As illustrated by the testimony of Jablonski, who was unable to define the term "aesthetically pleasing," J.A. at 494 (Jablonski Test. ("I don't think we have a definition of 'aesthetically pleasing . . . .' [I]t is ultimately my decision.")), aesthetics is a vague term that invites subjective judgments. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ("[E]sthetic judgments are necessarily subjective, defying objective evaluation."); *cf. Desert Outdoor Advertising*, 103 F.3d at 818 (holding that public officials had "unbridled discretion" in deciding whether to grant a permit for erection of a sign or structure where officials could deny the permit when the structure or sign was "detrimental to the aesthetic quality of the community"). We have no doubt that the application of the term "aesthetically pleasing" will substantially vary from individual to individual, for "[w]hat is contemptuous to one . . . may be a work of art to another." *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (quotation omitted). Since it is not susceptible to objective definition, the "aesthetically pleasing" requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing. It is precisely this danger of arbitrary and discriminatory application that violates the basic principles of due process. We therefore conclude that the district court erred in determining that UFCW is not substantially likely to succeed on the merits of its facial challenge to SORTA's advertising policy on vagueness grounds.

### 2. Overbreadth Doctrine

In addition to holding SORTA's advertising policy facially unconstitutional on vagueness grounds, we believe the policy, specifically the ban on controversial ads that adversely affect SORTA's ridership, is constitutionally invalid under the overbreadth doctrine.[9] A statute, ordinance, or resolution is

---

**9.** During the proceedings below, the parties debated whether SORTA's advertising guidelines were viewpoint neutral. J.A. at 373–75 (Hr'g Br.

of Def. at 15–17); 397–98 (Post–Hr'g Br. of Def. at 6–7); 404–06 (Pl.'s Post–Hr'g Br. at 4–6). Although neither party utilized the term "over-

unconstitutionally overbroad when there exists " 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.' " *Leonardson,* 896 F.2d at 195 (quoting *City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Underlying the overbreadth doctrine is the concern that an overbroad statute will "chill" the exercise of free speech and expression by causing " 'those who desire to engage in legally protected expression ... [to] refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' " *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (quoting *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)); *see also Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1182 (6th Cir.1995). A statute may be invalidated on its face as overbroad, however, only where the overbreadth of the statute is "substantial." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *see also Jews for Jesus,* 482 U.S. at 574, 107 S.Ct. 2568.

As stated previously, SORTA's advertising policy prohibits controversial advertisements that may adversely affect its ability to attract and maintain its ridership. Expressive activity may stir-up controversy in two different ways. First, "[i]ndependently of the message the speaker intends to convey, the *form*

of his communication may be offensive." *Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n,* 447 U.S. 530, 547, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring) (emphasis added). Second, "[o]ther speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message." *Id.* at 547–48, 100 S.Ct. 2326. Thus, SORTA's prohibition against controversial advertisements adversely affecting its ridership reaches not only ads controversial because of their form, but also ads controversial because of their message. We therefore must carefully examine whether the advertising policy's prohibition conceivably could lead SORTA's officials to reject a proposed advertisement because of the viewpoint expressed, a power they do not have under the First Amendment.

■ We believe any prohibition against "controversial" advertisements unquestionably allows for viewpoint discrimination. A controversy arises where there exists a "disputation concerning a matter of opinion." RANDOM HOUSE UNABRIDGED DICTIONARY 443 (2d ed.1993). An opinion that conforms with prevailing community standards is unlikely to prove contentious. *Cf. Finley,* 118 S.Ct. at 2181 (Scalia, J., concurring) (where statute required the National Endowment for the Arts to take into consideration general standards of "decency and respect," "[t]he applicant who displays 'decency,' that is, '[c]on-

---

broad," the substance of their arguments raised below essentially involved a facial challenge to SORTA's advertising policy on the ground that the policy's guidelines are unconstitutionally overbroad by permitting SORTA officials to reject a proposed advertisement on the basis of the viewpoint expressed. Though their arguments could have been presented more clearly to the district court, we nevertheless believe the parties' briefs placed before the district court the validity of the policy under the overbreadth doctrine. *Cf. International Union, UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1484 n. 11 (6th Cir.1983) (reviewing defendant's defense of accord and satisfaction even though defendant failed to use the words "accord and satisfaction" before the district court where defendant essentially raised the defense in substance, albeit in a confused fashion), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). The district court did not consider whether SORTA's advertising policy conceivably could lead to the rejection of a pro-

posed ad based on the viewpoint expressed. Although we will generally decline to consider in the first instance issues not considered by the district court, we will make an exception "where injustice might otherwise result, or where the issue presents only a question of law." *City Management Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 255 (6th Cir.1994) (citations omitted). Because the parties raised below the overbreadth argument in substance and the issue involves purely legal questions, we shall consider the issue on appeal. *See id.* (considering on appeal party's implied assumption argument where the argument "was actually raised below, even though it was not pressed at trial, and the issue presents only a question of law"); *cf. Hadix v. Johnson,* 144 F.3d 925, 935 (6th Cir.1998) (reviewing on appeal a facial challenge to law amended after district court proceedings where challenge involved purely legal issues and consideration of the matter by the appellate court furthered interest of judicial economy).

formity to prevailing standards of propriety or modesty,' and the applicant who displays 'respect,' that is, 'deferential regard,' for the diverse beliefs and values of the American people, will *always* have an edge over an applicant who displays the opposite." (citations omitted)). A viewpoint challenging the beliefs of a significant segment of the public, however, frequently will generate discord. Thus, an ad's controversy often is inseparable from the viewpoint it conveys. Indeed, Jablonski, SORTA's general manager, testified that he would reject a political ad that "got into specific, ... controversial *viewpoints.*" J.A. at 477 (Jablonski Test. (emphasis added)). In addition, Jablonksi made clear that he would not reject all ads whose content addressed union related matters, but only those expressing a more controversial perspective. J.A. at 476–77 (Jablonski Test.). Although Jablonski's testimony suggests a willingness to exclude controversial anti-union viewpoints as well as controversial pro-union positions, this does not mean that viewpoint discrimination may not occur. The nature of public discourse generally is "complex and multifaceted," not necessarily bipolar. *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510. Consequently, the "exclusion of several views on [an issue] is just as offensive to the First Amendment as exclusion of only one." *Id.* We therefore can conceive of numerous cases where under SORTA's advertising policy "it is the *treatment* of a subject, not the subject itself, that is disfavored." *Finley v. National Endowment for the Arts,* 100 F.3d 671, 683 (9th Cir.1996) (emphasis added), *rev'd on other grounds,* ── U.S. ──, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). The danger is very real and substantial that SORTA's rejection of a proposed advertisement due to the controversy generated by its message will have "a speech-based restriction as its sole rationale and operative principle." *Rosenberger,* 515 U.S. at 834, 115 S.Ct. 2510; *see also Lebron v. National R.R. Passenger Corp. (Amtrak),* 69 F.3d 650, 658 (2d Cir.1995) (suggesting that if Amtrak excluded controversial political ads from its advertising billboards, a nonpublic forum, its policy would be void for viewpoint bias); Majorie Heins, *Viewpoint Discrimination,* 24 HASTINGS CONST. L.Q. 99 (1996) (arguing that government actions that discriminate against speech deemed "controversial" violate the principle of viewpoint neutrality); *cf. Air Line Pilots Ass'n,* 45 F.3d at 1157 (stating that airport authority's exclusion of plaintiff's advertisement on the grounds that it undermined its commercial interests by offending the airport authority's largest airline customer was "troubling" because advertisement was objectionable only when considered in the context of the viewpoint the plaintiff wished to express).

Before we may invoke the overbreadth doctrine against SORTA's advertising policy, however, we must address whether a more limited or narrow construction of the policy would remove the threat to constitutionally protected speech. *See Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908. We will not, however, rewrite the guidelines to cure their substantial infirmities. *See United States v. National Treasury Employees Union,* 513 U.S. 454, 479 and n. 26, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (refusing to rewrite challenged statutory provision in order to correct for unconstitutional abridgement of speech under the First Amendment); *Chapman v. United States,* 500 U.S. 453, 464, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ("The canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction ... is not a license for the judiciary to rewrite language enacted by the legislature." (quotation omitted)). During the proceedings below, SORTA asserted that its advertising guidelines "have nothing to do with the viewpoint being expressed, but only with its mode of presentation." J.A. at 374 (Hr'g Br. of Def. at 16). We simply do not see such a limitation in the express language of SORTA's advertising policy. Rather, the policy's prohibition applies to "[a]dvertising of controversial *public issues,*" J.A. at 783 (Def.'s Ex. 501), which suggests to us that the prohibition is directly linked to the proposed advertisement's message. Moreover, the testimony of Jablonski demonstrates that SORTA itself does not in practice interpret its policy as suggested. J.A. at 477 (Jablonski Test. (testifying that under the policy, he would reject ads that conveyed "controversial viewpoints")). We

therefore cannot discern a reasonable interpretation of the policy that will eliminate its overbreadth. Accordingly, we conclude that the policy's broad prohibition against controversial advertisements that may adversely affect SORTA's ridership threatens to chill protected expressive activity, thereby providing an additional rationale in support of the district court's issuance of a preliminary injunction in favor of the Union and against SORTA.

### C. Conclusion Regarding Likelihood of Success

In sum, we conclude that UFCW has demonstrated a strong likelihood that it will succeed on the merits of its First Amendment claims. SORTA created a limited public forum and fails to show a compelling state interest for excluding the Union's advertisement. Furthermore, even if we did not conclude that a public forum was created, we also conclude that the district court correctly determined that SORTA's rejection of the proposed Red Bus ad was not reasonable in light of the forum's purpose. Finally, UFCW is likely to succeed on its facial challenge to SORTA's advertising policy on the grounds that the policy is both unconstitutionally vague and overbroad.

### IV. IRREPARABLE HARM, HARD-SHIP TO OTHERS, AND THE PUBLIC INTEREST

■ Relying on the plurality opinion in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the district court held that in light of its conclusion that the UFCW was likely to succeed on the merits of its First Amendment claims, UFCW will suffer irreparable harm without an injunction because " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " J.A. at 49 (Dist. Ct. Op. and Order at 19 (quoting *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673)). This court previously has approved the granting of a preliminary injunction on the grounds that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris,* 888 F.2d

371, 378 (6th Cir.1989); *see also Foti v. City of Menlo Park,* 146 F.3d 629, 643 (9th Cir. 1998) (quoting *Elrod* ); *New York Magazine,* 136 F.3d at 127 (2d Cir.1998) (same); *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). The irreparable injury stems from " 'the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.' " *Newsom,* 888 F.2d at 378 (quoting *Cate v. Oldham,* 707 F.2d 1176, 1188–89 (11th Cir.1983)). Consequently, in demonstrating a likelihood of success on the merits of their First Amendment claim, UFCW has also demonstrated irreparable harm.

■■ The harm to UFCW's First Amendment rights should the preliminary injunction not be issued must be weighed against the harm to others from the granting of the injunction. The district court concluded that requiring SORTA to run the Red Bus ad would not bring any substantial harm upon the defendant. J.A. at 50 (Dist. Ct. Op. and Order at 20). As explained previously, the district court reasonably concluded that running the Red Bus ad would not adversely affect SORTA's image or ridership. Accordingly, the district court correctly concluded that substantial harm will not befall SORTA from the issuance of the preliminary injunction.

■ Finally, the district court correctly concluded that "the public interest that would be served by the granting of a preliminary injunction outweighs any public interest that would be served by denying it." J.A. at 50 (Dist. Ct. Op. at 20). SORTA failed to show that the public's interest in safe and efficient transportation would be affected. In contrast, failure to issue the injunction would harm the public's interest in protecting First Amendment rights in order to allow the free flow of ideas.

■ In sum, we hold that the district court correctly concluded that the balance of the four preliminary injunction factors

weighs in favor of UFCW: UFCW has demonstrated a likelihood of success on the merits of its First Amendment claim; UFCW has shown it will suffer irreparable harm if SORTA continues to reject the Red Bus ad;[10] and the public interest will be served by the granting of the injunction.[11]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's granting of the preliminary injunction. We lift our emergency stay of the preliminary injunction, and we remand this case to the district court for further proceedings consistent with this opinion.

WELLFORD, Circuit Judge, concurring.

I concur in the result reached in this difficult case, but I express my disagreement with the majority's determination in part III A.1. that SORTA's advertisement policy created a "designated public forum." I think it clear, as determined by the district court, that SORTA did not make its exterior bus advertising space "generally available" to entities such as Local 1099 on an essentially unrestricted basis. *See Arkansas Educ. Television Comm'n v. Forbes*, — U.S. —, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998).

An analysis of the merits of a claim that the state has restricted First Amendment freedoms by denying access to public property, as the Union urges in this case, requires a court to place the public property at issue in one of three categories: traditional public fora, designated public fora, or nonpublic fora. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In the first two types, the state may enact content-neutral time, place, and manner restrictions on speech so long as those restrictions serve a significant government interest and "leave open alternative channels of communication." *Local No. 1099 v. SORTA*, No. 97–512 (S.D.Ohio Sept. 15, 1998) (district court order in this case which granted the preliminary injunction and which relied on *Cornelius* and *Perry*). The state may also enact content-based restrictions in these two fora *if the* restriction is necessary to serve a compelling state interest and is narrowly drawn to achieve it. *Id.* In the case of a nonpublic forum, however, the state may enforce not only content-neutral time, place, and manner restrictions, but may also "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. A threshold question on the analysis of likelihood of success on the merits, therefore, is what sort of forum Metro buses are.

**10.** SORTA argues that the preliminary injunction issued by the district court is "broader than necessary to accomplish the end it sought to achieve." *See* Def.-appellant's Br. at 36. The Union has shown that it was likely to succeed on the merits of its claim that SORTA violated its First Amendment rights when SORTA denied the Union access to SORTA's advertising space, and that the Union will suffer irreparable harm if SORTA continues to deny the Union the access sought. We therefore do not believe a preliminary injunction that grants the Union the access it requests is "broader than necessary" to prevent irreparable injury to the Union's First Amendment rights.

**11.** SORTA contends that the district court prematurely awarded UFCW substantially all of the relief sought. *See* Def.-Appellant's Br. at 21. SORTA "improperly equates 'likelihood of success' with 'success,' and ... ignores the significant procedural differences between preliminary

and permanent injunctions." *University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). As the district court made clear in its order denying the defendant's motion for a stay pending an interlocutory appeal, the district court considered the merits of the Union's claims solely for the purpose of determining whether the Union demonstrated a likelihood of success on the merits of its First Amendment claims; the district court did not render binding conclusions of law or fact on the constitutional issues raised by UFCW. J.A. at 431 (Order Denying Def.'s Mot. for Stay pending Appeal at 3). Should UFCW fail to prevail after a full trial on the merits, the preliminary injunction will be vacated. Should the Union ultimately prevail on the merits, the district court must then consider UFCW's request for a permanent injunction, damages, and reasonable attorney fees.

Transit system advertising space does not automatically constitute a public forum. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion). Property that is not traditionally a public forum may, however, become a public forum if the state allows the property to be used as a place for expressive activity. *See Perry*, 460 U.S. at 45, 103 S.Ct. 948. In deciding whether the state has allowed its property to become a public forum, courts should look at "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. Courts that have found that advertising space on transit systems has become a public forum have done so where the transit authority maintained no system of control over the ads its accepts. *See Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225, 1232 (7th Cir.1985) (noting that access was "virtually guaranteed to anyone willing to pay the fee"); *Coalition for Abortion Rights and Against Sterilization Abuse v. Niagara Frontier Transp. Auth.*, 584 F.Supp. 985, 989 (W.D.N.Y.1984) (noting that no witness could recall an instance in which an ad had been rejected for content).

Unlike the situation in *Planned Parenthood* and *Coalition for Abortion Rights*, SORTA has vigorously enforced its advertising policy. Not only does the policy state that SORTA advertising space is not a public forum, it makes clear that all ads are subject to SORTA's approval. Furthermore, SORTA's practice is consistent with its written policy's intent to maintain the advertising space as a nonpublic forum. Although it accepts a wide range of ads, it has also rejected various ads that did not meet the criteria outlined in the policy. Thus, SORTA, in fact, has prevented its advertising space from becoming a public forum for First Amendment expression. I would hold that the district court properly concluded that SORTA's ad space constituted a nonpublic forum. As such, the restriction on speech, which forms the basis for this case, will stand if it "is reasonable in light of the purpose

which the forum at issue serves." *Perry*, 460 U.S. at 49, 103 S.Ct. 948.

The majority concedes that "the Supreme Court has been reluctant to hold that the government intended to create a designated public forum when it followed a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers," *see* Majority Opinion ¶ 19, and that SORTA had an "apparently consistent policy of limiting access to its advertising space." Majority Opinion ¶ 31. This should be dispositive of the issue, but the majority instead reaches the opposite conclusion, relying primarily on *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242 (3d Cir.1998), which I do not find to be persuasive. The policies and practices of SEPTA differed materially from those of SORTA. Unlike the majority, I find SORTA's purposes for limiting advertising were related to the forum's intended use and that SORTA has not transformed the buses into a designated public forum. *See Citizens for Hyland v. SORTA*, No. 98–713 (S.D.Ohio Oct. 2, 1998) (order denying preliminary injunction in case with the same defendant and indistinguishable facts).

Despite the disagreement expressed above, I concur with the majority's alternative rationale in part III A.2. which affirms the decision of the district court with respect to the reasonableness of SORTA's actions. I find this issue to be very close, particularly in light of the facts and decision in *Citizens for Hyland, supra*. I would, accordingly, **AFFIRM** the district court despite my reservations about whether SORTA's actions in this case were unreasonable as claimed by the majority.