**EAST TIMOR ACTION NETWORK, INC., Plaintiff,**

v.

**The CITY OF NEW YORK; the New York City Department of Transportation; Wilbur Chapman, Commissioner of the New York City Department of Transportation; and Robert Adamenko, Assistant Commissioner of the Office of Special Events of the New York City Department of Transportation, Defendants.**

**No. 99 CIV. 3664(RWS).**

United States District Court, S.D. New York.

Nov. 3, 1999.

---

Center for Constitutional Rights, New York, Nancy Chang, Michael Ratner, of counsel, Emery Cuti Brickerhoff & Abady, New York City, Matthew Brickerhoff, David H. Gans, of Counsel, for Plaintiff.

Honorable Michael D. Hess, Corporation Counsel of City of New York, New York City, Gabriel Taussig, Robin Binder, of counsel, for Defendants.

*OPINION*

SWEET, District Judge.

Plaintiff East Timor Action Network ("ETAN") has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment, seeking a declaration that defendants the City of New York ("the City"), the New York City Department of Transportation ("DOT"), Wilbur Chapman, Commissioner of DOT ("Chapman"), and Robert Adamenko, Assistant Commissioner of the Office of Special Events of DOT ("Adamenko"), violated the Civil Rights Acts of 1871, 42 U.S.C. § 1983, by refusing to grant an application for erection of temporary street signs stating "1991 Santa Cruz Massacre" and "Free East Timor." The Defendants have cross-moved for summary judgment, seeking dismissal of ETAN's complaint. Upon the facts and conclusions set forth below, ETAN's motion is granted in part, Defendants' motion is denied, and judgment will be entered granting certain of the relief sought in the complaint.

***Prior Proceedings***

ETAN filed suit against Defendants on May 19, 1999, and by order to show cause sought a preliminary injunction to compel the City to erect temporary street signs entitled "Free East Timor" at the southeast corner of 68th Street and Madison Avenue and the northwest corner of 68th Street and Fifth Avenue, in Manhattan, near the Indonesian Consulate. ETAN sought to have the signs erected prior to the 23rd anniversary of the annexation of East Timor on July 17, 1976, in connection with a planned demonstration for the anniversary date, and prior to the referendum on independence which was conducted in East Timor on August 30, 1999.

After an initial hearing, the parties on June 28, 1999, stipulated to the erection of temporary street signs at the requested locations stating "East Timor Way," thus mooting the motion for a preliminary injunction.

Discovery was undertaken, the parties agreed upon a stipulation of facts, and the instant motions were marked fully submitted on August 5, 1999.

***Facts***

ETAN is a not-for-profit corporation dedicated to human rights and self-determination for the people of East Timor, a territory situated 400 miles north of Australia in the Indonesian archipelago. East Timor was annexed by Indonesia on July 17, 1976. ETAN was founded in 1991 and incorporated under the laws of the State of New York as a not-for-profit corporation in 1998. Its primary activities include lobbying the United States Congress and the United Nations, offering public education programs, organizing demonstrations and rallies, and providing information to the media. ETAN has 24 chapters in the United States, including a significant New York chapter.

The City is a municipal corporation, and the individual defendants are the officers with responsibility for supervising the administration of street signs in the City.

***The Requests By ETAN and the Denials by the City***

By letter to DOT dated September 16, 1998, ETAN requested that two temporary street name signs, bearing the words "1991 Santa Cruz Massacre," be posted by November 8, 1998 at the southeast corner of 68th Street and Fifth Avenue and the northwest corner of 68th Street and Madison Avenue in Manhattan, to commemorate an unprovoked massacre of 271 people in Dili, East Timor by Indonesian soldiers. The Consulate of Indonesia is mid-block on 68th Street between Madison and Fifth. DOT denied ETAN's request by way of letter from Adamenko dated October 1, 1998, which stated:

> Due to the sensitive political nature of this request, I must deny your request for the two temporary street name signs. A street renaming to promote products, commercial entities, political parties and/or candidates is prohibited.

By letter dated March 19, 1999, ETAN requested that two temporary street name signs bearing the message "Free East Timor" be posted by July 17, 1999 at the same locations near the Indonesian Consulate—the southeast corner of 68th Street and Fifth Avenue and the northwest corner of 68th Street and Madison Avenue—to commemorate the 23rd anniversary of the annexation of East Timor by Indonesia. ETAN's letter further stated:

> For the past six years, ETAN has conducted a protest demonstration on the anniversary of the annexation of East Timor. This year, ETAN's rally will be held on July 17, 1999 in front of the Indonesian Consulate. ETAN would like to unveil the installed signs during the rally.

Adamenko informed ETAN, in telephone conversations followed by a letter dated May 11, 1999, that its request for temporary street name signs had been denied. In one of his telephone conversations with ETAN's representative, Adamenko stated that DOT would not grant ETAN's request because the proposed sign's message was "very political" and would "inflame the diplomatic community." Thereafter, Adamenko sent ETAN a letter stating that the request had been denied because "the renaming of a street to promote political parties is prohibited."

Thereafter, as set forth above, the City on June 28 agreed to erect a temporary street sign stating "East Timor Way," and ETAN withdrew its application for a preliminary injunction.

***The Designation of Street Signs***

DOT is the mayoral agency "responsible for all those functions and operations of the City relating to transportation." New York City Charter § 2903. As such, DOT is required to erect and maintain all traffic and highway signs in the City, including "signs ... indicating the names of streets and other public places ..." ("street name signs"). City Charter § 2903(a)(2).[1]

1. City Charter § 2903(a)(2) provides in full that DOT's commissioner shall "establish, determine, control, install and maintain the design, type, size and location of any and all

DOT installs all traffic and highway signs, including street name signs, in accordance with the Manual on Uniform Traffic Control Devices adopted by the Federal Highway Administrator. Pursuant to that manual, street name signs have a white border, white lettering at least four inches high, and a green background. Made of reflectorized aluminum with lettering on both sides, street name signs are erected on metal street light and/or traffic light poles which are located on the sidewalk on diagonally opposite corners at each intersection.

The City makes its primary designation of its streets and street corners by way of local laws enacted by the City Council. In addition to enacting local laws changing the primary designation of a street, the City has given streets and street corners supplemental designations to honor various people, places, and events by legislative action of the City Council, Mayoral designation, or administrative grant of requests by entities not connected with the City. While a change in the primary designation of a street requires an amendment to the City map, a map change is not required when a street or street corner is given a supplemental designation to honor a person, place or event. *See* New York City Administrative Code § 25–102.1.

When the City Council enacts a local law naming a street or street corner, DOT installs a sign indicating the street's new name. In circumstances where the new designation by the City Council or the Mayor is supplemental and the City map is not changed, the sign bearing the street name added by the local law is "placed adjacent to or near" the sign bearing the name of the street indicated on the City map. In some instances, the City Council has enacted local laws naming streets or street corners to honor certain people, places, and events associated with political causes supported by Council members and their constituents. The Mayor has also directed supplemental signage.

In addition to installing supplemental street name signs pursuant to local law or Mayoral direction, DOT installs signs temporarily naming streets or street corners under certain circumstances at the request of private individuals or organizations not related to the City. Temporary street name signs have white lettering and a white border on a background of blue, the color designated for informational highway signs by the Manual on Uniform Traffic Control Devices; they are identical to local law street name signs in all other respects. Temporary street name signs are erected on metal poles at designated intersections in the same manner as local law street name signs. These signs are generally taken down within 30 days.

Private requests for temporary street or street corner designations are considered and determined by Adamenko, as head of DOT's Office of Special Events. There is no process of review of his determinations. In 1996, Adamenko's predecessor authorized DOT's Standard Operating Procedure 96–1 ("SOP 96–1"), which sets forth written guidelines for determining requests by private individuals and organizations for temporary street name designations to memorialize DOT's existing practices and procedures for dealing with such requests. SOP 96–1 is given to any applicant seeking a temporary street name.

SOP 96–1 states, in relevant part:

***Purpose of Street Renaming***

> The Department of Transportation permits the temporary renaming of streets if the street name promotes or commemorates one or more of the following:
>
> • a public event of a not-for-profit nature

signs, signals, marking, and similar devices indicating the names of the streets and other public places and for guiding, directing or otherwise regulating and controlling vehicular and pedestrian traffic in the streets, squares, parks, parkways, highways, roads, alleys, marginal streets, bridges and other public ways of the city."

- a cultural event
- an event or person of historic significance
- an individual who has made a significant contribution to New Yorkers
- a community or public service.

A street renaming to promote products, commercial entities, political parties and/or candidates is prohibited.

SOP 96-1 further states that written requests for temporary street name signs are to be submitted to DOT's Office of Public Events and Marketing (the former name of DOT's Office of Special Events), that a maximum of two signs are permitted, that the signs will be installed for a maximum of 30 days, and that the cost of the signs and any unveiling ceremony will be borne by the applicant.

Temporary street name signs are typically erected in connection with ceremonies celebrating cultural or civic events or honoring individuals involved in City life. Examples include street name signs celebrating the opening of plays or musicals (*e.g.*, "Victor Street and Victoria Way," "State Fair Way," and "Beauty Way and Beast Ave"); the efforts of non-profit organizations (*e.g.* "Lenox Hill House Way," "Phoenix House Place," and "Hartley House Corner"); the contributions of civic or religious leaders (*e.g.* "Rabbi Meyer Blitzky Way," "Monsignor Dorney Way," "Rev. Calvin Rice Way," and "Dr. William A. Epps Street"), and the achievements of cultural and entertainment figures (*e.g.* "Yo Yo Ma Way," "Arthur Miller Way," and "Jackie Mason Way"). In addition, although SOP 96-1 states that DOT does not grant requests for street name signs honoring commercial entities or products, DOT has granted numerous requests for temporary street name signs honoring commercial entities and products (*e.g.* "People Magazine Way," "Sheraton Four Points Way," and "Barbie Street").[2]

DOT has not granted a temporary street sign request to promote a political party or candidate, nor one containing political rhetoric.

In 1984, Mayor Edward Koch temporarily renamed the southeast corner of Second Avenue and 44th Street—near the offices of the South African Government—"Nelson and Winnie Mandela Corner." At that time, the apartheid regime, which was firmly in place in South Africa, vigorously protested the renaming. The City Council later voted to approve the renaming and the sign continues to be on display.

In 1989, Mayor Koch temporarily renamed the corner of 12th Avenue and 42nd Street—which is directly outside of the Chinese Consulate—"Tiananmen Square Corner." Mayor Koch intended that the sign confront the Chinese Government, explaining "Every time the diplomats go in and out of this building they will see 'Tiananmen Square Corner' ..." The Chinese Consul General lodged a formal complaint with both New York City and the United States Department of State. As with the Nelson and Winnie Mandela sign, the City Council elected to make the Tiananmen Square sign permanent.

In the late 1980's, a portion of East 70th Street was renamed "United Jerusalem Place" to signify support for Israeli sovereignty over all of Jerusalem. Also in the 1980's, two areas near the United Nations were renamed in an effort to criticize the Soviet Union. In 1984, a set of steps in a park adjacent to the United Nations was renamed for Soviet dissident Anatoly Sharansky. In 1985, a section of First Avenue near the United Nations was renamed "Raoul Wallenberg Walk" in honor of the Swedish diplomat who died or disappeared in Soviet custody after World War II.

2. The line between culture and commerce blurs, as in the instance of "Beauty Way and Beast Avenue." Indeed, there is little doubt that temporary street signs provide essentially free publicity for commercial Broadway fare, and affect box office grosses as well as celebrate a cultural event.

In 1990, the City Council voted to name the street corner adjacent to the Metropolitan Correctional Center as "Joe Doherty Corner" after an admitted member of the Irish Republican Army. At the time Joe Doherty, a prisoner at the correctional center for eight years, was appealing a federal court order extraditing him to Northern Ireland. After the local law was signed by Mayor Dinkins, the British Ambassador sent a letter to the Mayor expressing his opposition to the legislation.

Recognizing that temporary street signs are a forum for expressive activities, in 1996 Mayor Giuliani erected a street sign near the Cuban mission naming the street "Esquino Hermanos Al Rescate/Brothers to the Rescue Corner," in support for Brothers to the Rescue, a Miami-based Cuban exile group dedicated to overthrowing Fidel Castro. This sign has caused intense disputes, including demonstrations, counter-demonstrations, protests, and at least one attempt to paint over the sign to erase its message. *See* David Gonzalez, *At One Corner, Two Perspectives on Cuba,* N.Y. Times, May 2, 1998, at B1.

In 1997, DOT denied a request from the United Committee to Save Nigeria for a temporary street name sign in memory of Kudirat Abiola, the slain wife of a Nigerian dissident, to be posted near the Nigerian Consulate. As noted below, a permanent street name sign was later erected after the City Council enacted a local law designating the street corner as "Kudirat Abiola Corner" despite the Nigerian Government's opposition, which included seeking relief in New York State court to bar the sign. *See Opusunju v. Giuliani,* 175 Misc.2d 541, 669 N.Y.S.2d 156 (Sup.Ct. 1997).

DOT also denied a 1997 request from the National Council on Islamic Affairs to erect four temporary street signs reading "Yaser Arafat Way" at 44th Street and Second Avenue in response to the designation by local law of Second Avenue between 42nd and 43rd Streets, the block where the Israeli Consulate is located, as "Yitzak Rabin Street."

In 1998, DOT approved a temporary street sign reading "Philippine Centennial Way" at 45th Street and Fifth Avenue at the request of the Consulate General of the Philippines. While the Philippine Government recognized the centennial, protests marked its observance in Manila, as demonstrators complained that "the subsequent takeover of the Philippines by the United States after its independence has been downplayed." *See Protest at Philippines Centennial,* Seattle Post–Intelligencer, June 13, 1998.

DOT approved and erected a temporary street sign reading "Gretchen Dykstra Way" in or near Times Square in May 1998, at the request of the Times Square Business Improvement District ("BID") in order to promote the BID's controversial president. Dykstra led the BID in what she termed "guerrilla tactics" against porn shops, harassing landlords to evict them, and advocating for zoning controls on adult shops. She also called for police raids on gay bars, though the area had traditionally been a "mecca for gay nightlife since the 1920s." *See* Richard Goldstein, *Porn Free,* Village Voice, September 1, 1998. While some people applauded Dykstra's efforts, other New Yorkers considered her an authoritarian force suppressing sexual freedom and expression. On the other end of the spectrum, DOT approved in 1996 a temporary street sign reading "The Gay Way," although it could anger religious conservatives and others who seek to further an anti-gay agenda.

DOT has also approved a number of signs promoting various religious figures, such as Rabbi Mordecai M. Kaplan, the founder of a secular branch of Judaism, and Patriarch Bartholomew, a Christian Orthodox leader. Such signs, of course, might be disapproved by persons who believe that religion should not be promoted on city streets and by those who reject the teachings of these particular religious sects.

***Discussion***

ETAN contends that the City violated the First Amendment on three grounds: (1) through SOP 96-1, the City created a limited public forum for expressive, message-bearing temporary street signs, yet unconstitutionally excluded ETAN's proposed signs from this limited public forum; (2) even if the forum at issue is assumed, *arguendo,* to be a nonpublic forum, the City still violated the First Amendment, since its exclusion of speech was not reasonable in light of the forum's purpose, and it discriminated on the basis of viewpoint; and (3) by vesting unlimited discretion in city officials to refuse approval of temporary street signs, the City created an unconstitutional prior restraint.

The City responds that (1) its street signs policy does not constitute a limited public forum but a nonpublic forum; (2) denials of ETAN's requests for temporary signs were reasonable and viewpoint neutral; and (3) city officials do not have unlimited discretion, and prior restraint of speech in a nonpublic forum, if reasonable, is constitutional. These three issues will be addressed in turn.

**I. *DOT's Temporary Street Sign Policy Constitutes a Limited Public Forum***

In accordance with the relatively recent development in the Supreme Court's First Amendment jurisprudence of the "limited public forum" doctrine, the street sign policy under consideration here constitutes such a forum. Although the roots of the doctrine are far older, its first comprehensive treatment appears in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), where the Court addressed the question whether a public school district's policy permitting one teachers' union, but not its rival union, to use an interschool mail system violated the First Amendment. In holding that the policy did not violate the First Amendment, the Court explained that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44, 103 S.Ct. 948. The Court went on to clarify that the character of such property assumes three basic forms.

At one end of the spectrum is the "traditional public forum"—exemplified by "streets and parks"—where "the rights of the State to limit expressive activity are sharply circumscribed." *Id.* at 45, 103 S.Ct. 948. ETAN does not claim that the City's street sign policy constitutes a traditional public forum.

At the other end of the spectrum is the "nonpublic forum." "[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Id.* at 46, 103 S.Ct. 948 (*quoting United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). "[T]he state may reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

Between the traditional public forum and the nonpublic forum lies the "limited public forum," which is created when "the State has opened [public property] for use by the public as a place for expressive activity." *Id.* at 45, 103 S.Ct. 948. As long as a state retains the open character of the forum, "it is bound by the same standards as apply in a traditional public forum." *Id.* at 46, 103 S.Ct. 948. Thus, "[r]easonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.; see also Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

The *Perry* Court then applied these categorical distinctions to the facts. The Court determined that the policy of permitting one union to use the interschool mail system did not create a limited public forum because the school board had not opened up the system for "indiscriminate use by the general public": permission generally had to be secured from the individual building principal, making access selective. *See Perry,* 460 U.S. at 47, 103 S.Ct. 948. The Court also noted in dicta that even if it had determined that the school board had created a limited public forum by, for example, "granting access to the Cub Scouts, YMCA's, and parochial schools, ... the constitutional right of access would in any event extend only to other entities of similar character." *Id.* at 48, 103 S.Ct. 948.

After determining that the forum at issue was nonpublic, the Court held that differential access for the two unions was reasonable because it preserved the property for the use to which it was lawfully dedicated. *See id.* at 50–51, 103 S.Ct. 948. The union which had been denied access did not at that time represent any of the district's teachers; it had previously lost an election. "[P]roviding exclusive access to recognized bargaining representatives is a permissible labor practice in the public sector." *Id.* at 51, 103 S.Ct. 948.

Soon after *Perry,* the Court in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), provided further explanation of what types of governmental policies could create a public forum:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.... [T]he Court has looked to the policy and practice of the government [and] the nature of the property and its compatibility with expressive activity.... We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor ... when the nature of the property is inconsistent with expressive activity.

*Cornelius,* 473 U.S. at 802–03, 105 S.Ct. 3439. The Court held that a charity drive aimed at federal employees and military personnel, which was limited to voluntary, tax-exempt, nonprofit charitable agencies that provide direct health and welfare services to individuals or their families and specifically excluded legal defense and political advocacy organizations, was a nonpublic forum. *See id.* at 806, 105 S.Ct. 3439.

This Circuit has on occasion divided the "limited public forum" into two subcategories: the "designated public forum" and the "limited public forum." *See, e.g., Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir.1991). *Travis* explained that a "designated public forum" exists when the government has opened up property for all kinds of expression, and a "limited public forum" exists when the government "opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis,* 927 F.2d at 692. While the Circuit does not always apply its own distinctions between "designated" and "limited" public fora, *see, e.g., New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123, 128 & n. 2 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998), the distinctions correctly identify an unresolved ambiguity in the Supreme Court's jurisprudence, which is examined in detail in the following excerpt from *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224 (2d Cir.1996):

> The Supreme Court has sent somewhat mixed signals as to the criteria for identifying a "limited" public forum. In *Perry,* the Court stated that a "public forum may be created for a limited purpose such as use by certain groups." *Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. 948. This view was reiterated in *Cornelius,* where the Court, explicitly citing the *Perry* footnote, stated:

In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. *Perry,* 460 U.S. at 45, 46 n. 7, 103 S.Ct. 948.

*Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. *Perry* illustrated what *might* constitute a "limited" public forum by stating that "even if we assume that by granting access to the Cub Scouts, YMCA's, and parochial schools, the School District has created a 'limited' public forum, the constitutional right of access would in any event extend only to other entities of similar character." *Perry,* 460 U.S. at 48, 103 S.Ct. 948.

However, the Court has also indicated that the granting of access to selected speakers or groups does not necessarily establish a "limited" public forum. In *Perry,* the Court stated that "selective access does not transform government property into a public forum." *Id.* at 47, 103 S.Ct. 948. The Court gives the example of Fort Dix, where access by some speakers did not result in a "limited" public forum available to other speakers. *See Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Similarly in *Cornelius,* though the Court says that a public forum may be created by government designation of a channel of communication "for use by certain speakers," *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439, it then says that "selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum," *id.* at 805, 105 S.Ct. 3439. Indeed, *Cornelius* makes the point that if permission for use is required and is not freely given, that in itself shows that a public forum has not been created. [FN4] *Id.* at 803–04, 105 S.Ct. 3439.

FN4. That view elicited a strong dissent from Justice Blackmun:

The Court's analysis empties the limited-public-forum concept of meaning and collapses the three categories of public forum, limited public forum, and nonpublic forum into two. The Court makes it *virtually* impossible to prove that a forum restricted to a particular class of speakers is a limited public forum.... The very fact that the Government denied access to the speaker indicates that the Government did not intend to provide an open forum for expressive activity.... *Cornelius,* 473 U.S. at 825, 105 S.Ct. 3439 (Blackmun, J., with whom Brennan, J., joins, dissenting).

What *Cornelius* leaves uncertain is what it means by "public use" for which access has been granted to limited groups or speakers. It is arguable that "such use" means that a channel of communication is open to the public at large—either for speaking or for listening—or open at least to a class of groups whose meetings or memberships are open to the public at large.... Alternatively, it is also arguable that the Court has in mind a use that is "public" to some degree, but not necessarily extending to the public at large....

However that interpretive issue might be resolved, the Supreme Court has made it sufficiently clear that whether a "limited" public forum has been created depends on several factors, in addition to the identity of those invited. The Court has examined, among other things, the nature of the property or means of communication, the Government's purpose in permitting whatever limited access it has allowed, and the conditions of access (*e.g.,* whether permission is required).

*Fighting Finest,* 95 F.3d at 229–30 (certain internal citations and footnotes omitted).

Application of these authorities to the facts before this Court establishes that DOT's policy of approving applications for temporary street signs from private entities constitutes the opening up of a limited

public forum. Defendants' contentions that street name signs do not constitute "a forum for public discourse," that they "simply designate the name of streets and street corners," and that their purpose "is to identify the permanent or temporary name of a particular street or street corner," (Defs.' Mem. Law in Supp. of Cross-Mot. for Summ. J., at 16–18), are flatly contradicted by both the language of SOP 96-1 and the past practices of DOT.

SOP 96-1 authorizes "[a]ny person or organization" temporarily to apply to rename a city street sign so long as its purpose is to promote or commemorate "a public event of a not-for-profit nature," "a cultural event," "an event or person of historic significance," "an individual who has made a significant contribution to New Yorkers," or "a community or public service." These purposes avowedly implicate expressive activities. In fact, the erection of a temporary sign commemorating or promoting an event or individual in that most public of places—the city street—is a quintessential act of expression. By contrast, there is no mention anywhere in the SOP that a purpose of the temporary signs is to identify the name of a street or corner. Indeed, such a purpose would be redundant and temporary. Even while a temporary sign is up, no cab driver—for example—would accept a direction to "the corner of Beauty Way and Beast Avenue," instead of "the corner of 47th and 7th," and no evidence has been presented to that effect.[3]

The practices of DOT in granting applications for temporary street signs confirm that the forum has been opened up to expressive activities. To give but one among many possible examples, "Yo Yo Ma Way" expresses a celebration and appreciation of the musical gifts of one of the world's greatest cellists.

Thus, although the SOP restricts certain limited types of expressive activities, the very public nature of the resultant forum in which the signs are placed (literally, the street itself), the fact that the purpose for creating the forum appears to have been precisely to permit expressive activities (in contrast to, for example, activities which raise funds for the state, facilitate communications within a work environment, help keep highways clean at limited taxpayer expense,[4] and so forth), and the relatively broad access afforded members of the public (anyone, so long as the proposed sign does not fall within one of the excluded categories), support a finding that the DOT's policy has created a limited public forum. *See New York Magazine,* 136 F.3d at 129 (recognizing that "[w]here the government acted for the purpose of benefitting the public" rather than "raising revenue or facilitating the conduct of its own internal business," courts will find that government created public forum); *Paulsen v. County of Nassau,* 925 F.2d 65, 70 (2d Cir.1991) (relying on the fact that "appellees' communicative activities" do not "threaten ... basic government functions"

3. The Defendants attempt to lump together temporary and permanent street signs for purposes of this analysis (while attempting to separate them at other points in their argument). But the only policy at issue in this case is the temporary street sign policy. Clearly, the argument that the purpose of *permanent* street signs is to identify streets has much greater force.

4. The terms of the SOP and the practices of DOT distinguish this case from *Texas v. Knights of the Ku Klux Klan,* 58 F.3d 1075 (5th Cir.1995), which held that Texas was not required to allow the Ku Klux Klan to erect a sign stating that the Ku Klux Klan had adopted a portion of the Texas highway. In concluding that the highway program was a nonpublic forum from which the Klan could be excluded, the Fifth Circuit emphasized that the purpose of the program was "to allow citizens an opportunity to support [the State's] efforts to control and reduce litter," not "the provision of a forum for expressive activity." *Id.* at 1078. Further, under the program "individuals and political organizations are subject to exclusion" and that, even for authorized groups, "[o]nly the name of the adopting group is placed on the sign, and no discourse or exchange of ideas is possible." *Id.* at 1078–79. The facts in the instant case are, of course, far different.

in finding that government created public forum); *cf. Air Line Pilots Ass'n, Int'l v. Department of Aviation,* 45 F.3d 1144, 1156 (7th Cir.1995) ("In discussing the nature of the property, a court cannot ignore the larger context.").

When the government intentionally opens a forum for expressive activity, as it has here, the government "must respect the lawful boundaries it has itself set." *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Travis,* 927 F.2d at 692 ("[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre."). "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *See Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998).

As the previous discussion indicates, the SOP expressly permits certain types of expressive activity; the SOP also expressly prohibits street renamings "to promote products, commercial entities, political parties and/or candidates." ETAN's proposed signs hardly fall within the SOP's prohibition on signs promoting "political parties and/or candidates," despite DOT's determination to the contrary. "1991 Santa Cruz Massacre" and "Free East Timor" quite obviously do not promote political parties or candidates, however political the message of the proposed signs might be in the broader sense.

However, courts look not only to a government's stated policy, but also to its actual practice, in determining whether the government has created a designated public forum and, if so, what the contours of that forum are. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439; *United Food & Commercial Workers Union v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 352–53 (6th Cir.1998); *Air Line Pilots,* 45 F.3d at 1153–54; *Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1374 (3d Cir.1990). This makes sense: if the government's stated policy that it did not intend a policy of open access was controlling, "the government could circumvent what in practice amounts to open access simply by declaring its 'intent' to designate its property a nonpublic forum in order to enable itself to suppress disfavored speech." *United Food,* 163 F.3d at 353; *Gregoire,* 907 F.2d at 1374 (focusing solely on government's stated policy "would effectively eviscerate the public forum doctrine; the scope of first amendment rights would be determined by the government rather than by the Constitution").

Here, there is little reason to rely exclusively on the SOP, since DOT by Defendants' own admission has repeatedly and flagrantly violated the terms of the SOP by approving countless applications for temporary street signs that promote products or commercial entities. In addition, DOT has on occasion rejected signs of a political nature which do not fall within the narrow prohibition of the SOP on promoting political parties and/or candidates, for example, "Yaser Arafat Street" and "Kudirat Abiola Corner." This practice is not consistent, however. DOT has approved temporary signs commemorating, *inter alia,* Philippine independence ("Philippine Centennial Way"), a Jewish victim of a Palestinian terrorist attack ("Leon Klinghoffer Place"), and environmental awareness ("Rain Forest Way"). Moreover, the reason given by DOT for denying the Arafat sign was that "as a rule, signs are only placed to honor deceased individuals"—a reason not listed in the SOP and patently false as a matter of practice, as evidenced by the signs commemorating Gretchen Dykstra, Patriarch Bartholomew, Yo Yo Ma, and others. DOT cannot now claim, *post hoc,* that the real reason for denying the application was the political nature of the sign. Given this inconsistency in practice, and the fact that the SOP

does not by its own terms prohibit signs of a political nature, it cannot be concluded that in practice the forum has been limited to signs of a non-political nature.[5]

In addition, the actions of the Mayor and of the City Council in erecting temporary street name signs reinforce the conclusion that the forum includes signs of a political nature.

A somewhat different question arises regarding the grammar of the signs. Although the SOP does not indicate any grammatical restrictions, in practice nearly all of the applications and approved signs include a designation such as "Street," "Way," "Corner," and so forth, and do not include any verbs. Neither of ETAN's applications included a designation such as "Street." Moreover, the word "Free" in "Free East Timor" is most likely meant to be understood as a verb (though it could arguably be an adjective). These distinctions were recognized when the parties, after a hearing before this Court, stipulated that signs reading "East Timor Way" would be temporarily erected in place of ETAN's original request for signs reading "Free East Timor." The distinctions do not affect the disposition of the instant motions, however. DOT did not reject ETAN's applications for their incorrect grammatical format, but for the political nature of the proposed signs. Had DOT rejected the applications for improper grammatical format, ETAN presumably would have submitted amended applications correcting the defect (e.g., "1991 Santa Cruz Massacre Way").

In sum, weighing the SOP in light of DOT's actual practices, the limited public forum which the City opened up through its policy of erecting temporary street signs following approval of an application with DOT only actually consistently excludes signs which promote political parties and/or candidates. Products and commercial entities, notwithstanding the SOP's language, and—most notably—signs of a political nature which do not promote parties or candidates, fall within the contours of the limited public forum. As indicated above, "1991 Santa Cruz Massacre" and "Free East Timor" fall within those contours.

■ Because the City denied ETAN the right to erect message-bearing signs permitted within the limited public forum created by the City, that denial is subject to strict scrutiny, *i.e.*, the government must have a compelling reason for the denial and it must be narrowly tailored. *See Forbes,* 118 S.Ct. at 1641. Keeping politically sensitive speech out of the designated forum is not a compelling reason. "The avoidance of controversy is not a valid ground for restricting speech in a public forum ...." *Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439; *United Food,* 163 F.3d at 355 ("We think it self-evident that excluding the Union's advertisement based on ... the limited possibility of controversy fails th[e] historically stringent [strict scrutiny] test."). Indeed, political speech is at the very core of the constellation of expressive rights protected by the First Amendment. Therefore, the denial of ETAN's applications for temporary erection of the signs was unconstitutional.

## II. *DOT's Denial Was Not Viewpoint Neutral*

■ Even if it is assumed, *arguendo,* that the forum here is a nonpublic forum, the denial of ETAN's requests still violated the First Amendment. In a nonpublic forum, "[t]he State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger,*

5. The Court recognizes that whether a sign is "political" does not necessarily admit of a "yes" or "no" answer. It is to a certain extent a matter of degree and depends on the eye of the beholder. But this uncertainty makes it all the more unsettling when a city administrator routinely ignores the stated policy of his agency and makes ad hoc final determinations that do not demonstrate any consistent approach.

515 U.S. at 829, 115 S.Ct. 2510 (*quoting Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). The reasonableness of a government restriction of access to a nonpublic forum is assessed "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439. As to viewpoint neutrality, the government may make distinctions based on content and speaker identity in limiting access to a nonpublic forum; it may not, however, oppose access "merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

ETAN's proposed signs were not "inconsistent with the intended use of the forum," and thus, the City's denials were not reasonable. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 692, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (O'Connor, J., concurring); *United Food,* 163 F.3d at 358 (demanding a showing that "proposed conduct would 'actually interfere' with the forum's stated purposes"); *Air Line Pilots,* 45 F.3d at 1159 (same). Because restrictions on speech in a nonpublic forum "must be designed to 'reserve the forum for its intended purposes,' the overall assessment must be undertaken with an eye to the 'intended purposes' of [the forum] and of the ways in which the regulated conduct ... might actually interfere with the carrying out of those purposes." *Multimedia Publ'g Co. v. Greenville–Spartanburg Airport Dist.,* 991 F.2d 154, 159 (4th Cir.1993). As the previous section of this Opinion explained in detail, the primary purpose of the DOT temporary street sign policy is precisely to permit a wide range of commemorative street signs to be erected as an expressive activity. Both of ETAN's requests were for commemorative street signs.

Viewpoint neutrality is a closer issue. As Justice Kennedy acknowledged in *Rosenberger,* the distinction between content and viewpoint "is not a precise one." *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510. Defendants' position—identical in most respects to their position with regard to the limited public forum issue—is that DOT's policy as implemented was permissibly based on content, not viewpoint, that content being politically sensitive signs. As indicated previously, that position is betrayed by the facts. Certain politically sensitive signs were permitted, and certain politically sensitive signs were not permitted (sometimes for reasons having nothing to do with the political sensitivity of the sign). Therefore, DOT engaged in constitutionally impermissible viewpoint discrimination.

### III. *The SOP Constituted a Prior Restraint*

The Supreme Court has held that to curtail the risk of viewpoint discrimination,

> A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.... If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgement of our precious First Amendment freedoms is too great to be permitted.

*Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (citations and internal quotations omitted); *see also City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (noting that narrow and objective standards are necessary to avoid giving "a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers"); *Beal v. Stern,* 184 F.3d 117 (2d Cir.1999) (explaining that "[a] constitutional limitation on excessive official discretion exists because a regulation susceptible to arbitrary application 'has

the potential for becoming a means of suppressing a particular point of view.' ") (*quoting Nationalist Movement,* 505 U.S. at 130, 112 S.Ct. 2395).

The sign approval process constitutes a prior restraint since it "g[i]ve[s] public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *see also Beal,* 184 F.3d at 124. This is true even though the street signs on which ETAN wished to display its message were owned by the City. *See Southeastern Promotions,* 420 U.S. at 555, 95 S.Ct. 1239 ("Respondents' action was no less a prior restraint because the public facilities under their control happened to be municipal theatres."); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1196–1200 (11th Cir.1991) (invalidating standardless grant of discretion to state official to deny permission to place newsracks at state-owned interstate rest areas, a nonpublic forum).

The City construed the SOP to permit the denial of approval to any sign based on a belief that the message expressed in the sign will generate controversy. Far from being the "narrow, objective, and definite" standard required by the First Amendment, the "political controversy" standard is wholly subjective and indeed encourages impermissible viewpoint discrimination. The Court's analysis in *Nationalist Movement* applies squarely here:

> The decision ... is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing ... prevents the official from encouraging some views and discouraging others.... The First Amendment prohibits the vesting of such unbridled discretion in a government official.

*Nationalist Movement,* 505 U.S. at 133, 112 S.Ct. 2395; *see also United Food,* 163 F.3d at 359 ("We have no doubt that standing alone, the term 'controversial' vests the decisionmaker with an impermissible degree of discretion.").

The arbitrary nature of the decisions made under SOP 96–1 is established by the failure of the City even to apply SOP 96–1 consistently. Despite its flat prohibition against commercial signs, the facts establish that many commercial signs were permitted. Not only was SOP 96–1 interpreted in an unconstitutional manner, its strictures were arbitrarily ignored.

***Conclusion***

For the reasons set forth above, the City's denial of ETAN's application for a temporary street sign stating "1991 Santa Cruz Massacre" violates ETAN's First Amendment rights. ETAN is entitled to a declaratory judgment to that effect.

The City is entitled to judgment dismissing the cause of action based upon the denial of the request for a sign reading "Free East Timor," given the stipulation to erect, instead, a sign reading "East Timor Way."

Settle judgment on notice.

It is so ordered.